IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ABINGDON DIVISION

| | | |
|---|---|---|
| **BILL J. CRAIG,** | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 1:11CV00007 |
| | ) | |
| v. | ) | **OPINION** |
| | ) | |
| **MICHAEL J. ASTRUE,** | ) | By: James P. Jones |
| **COMMISSIONER OF** | ) | United States District Judge |
| **SOCIAL SECURITY,** | ) | |
| | ) | |
| Defendant. | ) | |

*Joseph E. Wolfe, Wolfe, Williams, Rutherford & Reynolds, Norton, Virginia, for Plaintiff; Eric P. Kressman, Regional Chief Counsel, Region III; Rafael Melendez, Special Assistant United States Attorney, Office of the General Counsel, Social Security Administration, Philadelphia, Pennsylvania, for Defendant.*

In this social security case, I affirm the final decision of the Commissioner.

I

Plaintiff Bill J. Craig filed this action challenging the final decision of the Commissioner of Social Security (the "Commissioner") denying his claim for disability insurance benefits ("DIB") pursuant to Title II of the Social Security Act ("Act"), 42 U.S.C.A. §§ 401-433 (West 2003 & Supp. 2011). Jurisdiction of this court exists pursuant to 42 U.S.C.A. §§ 405(g) and 1383(c)(3).

Craig filed for benefits on April 30, 2008, alleging that he became disabled on April 18, 2008. His claim was denied initially and upon reconsideration. Craig received a hearing before an administrative law judge ("ALJ"), during which Craig, represented by counsel, and a vocational expert testified. The ALJ denied Craig's claim, and the Social Security Administration Appeals Council denied his Request for Reconsideration. Craig then filed his Complaint with this court, objecting to the Commissioner's final decision.

The parties have filed cross motions for summary judgment, which have been briefed. The case is ripe for decision.

II

Craig was born on February 28, 1961, making him a younger person under the regulations as of the alleged disability onset date. 20 C.F.R. § 404.1563(c) (2010). Craig completed the twelfth grade and has a GED. He has worked in the past as a laboratory technician, an assembly worker, and an electrical repair assistant. Craig originally claimed he was disabled due to diabetes, vision problems, leg pain, anxiety, depression, and learning disabilities.

In February 2008, Craig was seen by James P. Callanan, O.D., for an eye examination. Best corrected visual acuities were O.D. 20/30 and O.S. 20/30-. Dr. Callanan opined that Craig had no signs of visual impairment or visual disability.

In March 2008, Craig sought treatment for complaints of shortness of breath, decreased appetite, fatigue, blurred vision, and chest pain. John F. Williams, M.D., conducted laboratory tests and diagnosed Craig with diabetes mellitus. Dr. Williams encouraged him to stop smoking and to carefully follow a diabetic diet and exercise program.

On March 11, 2008, Craig was referred to Andrew M. Cross, Jr., M.D., for an evaluation of chest pain and shortness of breath. Craig also complained of fatigue, weight loss, and night sweats. Dr. Cross noted that Craig had clear lungs and a regular heart rate. Stress testing revealed no obvious evidence of stress-induced ischemia.

In May 2008, Craig was treated by Ashvin A. Patel, M.D., for recurrent major depression. Dr. Patel noted that Craig had been fired from a couple of jobs, and that he appeared depressed with some psychomotor retardation. Craig reported suicidal thoughts, but stated that he did not think he would harm himself. Dr. Patel increased his Imipramine and recommended that Craig start seeing a therapist.

Craig returned to Dr. Patel in July 2008, reporting that he was doing better and that his medication had reduced some of his depression. Dr. Patel reported that Craig was basically stabilized and appeared less depressed, but that he was having a hard time finding and holding down a job. He encouraged Craig to continue his medication and to abstain from alcohol.

Frank M. Johnson, M.D., a state agency physician, reviewed Craig's medical records on July 15, 2008. He found Craig to be partially credible and diagnosed him with diabetes mellitus. Dr. Johnson opined that Craig was capable of performing a range of light work. On November 12, 2008, a second state agency physician, Richard Surrusco, M.D., offered an identical assessment.

Richard J. Milan, Jr., Ph.D., a state agency psychologist, reviewed Craig's medical records and completed a Mental Residual Functional Capacity Assessment on July 15, 2008. He reported that Craig could understand, retain, and follow simple job instructions, and could maintain concentration and attention for extended periods of time. Dr. Milan opined that Craig could be expected to complete a normal workday and workweek without exacerbation of psychological symptoms. He diagnosed Craig with a learning disorder, by history, and depressive syndrome. A second state agency psychologist, Louis Perrott, Ph.D., offered an identical assessment on November 12, 2008.

In March 2009, Craig returned to Dr. Patel, complaining of continued depression and anxiety, as well as fear, panic, and suicidal feelings with no plan. He stated that he continued to feel like he could not work. Dr. Patel continued Craig on his previous medications and prescribed Celexa. He encouraged Craig to start seeing a new therapist.

Craig returned to Dr. Williams several times from June 2009 to August 2009. During this time period, he complained of hypertension, fatigue, blurry

vision, anxiety, depression, insomnia, and numbness in his left leg and foot. Dr. Williams conducted laboratory testing and diagnosed him with diabetes mellitus and dyslipidemia.

In July 2009, Craig was evaluated by Danny A. Mullins, M.D., for numbness in his left leg from the knee down, and to a lesser degree in his right leg. Dr. Mullins noted a palpable dorsalis pedis pulse. He suspected that Craig was developing a diabetic neuropathy.

At the administrative hearing held in September 2009, Craig testified on his own behalf. Although he stated he could not read or write, he testified that he passed the GED test, read equipment gauges at work, and was able to drive and recognize traffic signs. He testified that he worked at Bristol Compressors for twenty years on the assembly line and in the engineering laboratory. He also stated that he worked briefly as a part sorter for a cell phone company. Craig testified that he regularly travels to the bank, takes care of his father, and cleans the house, including vacuuming, mopping, and doing laundry. He stated that he goes to church, fishes, and hunts.

Jeanie Hamburg, a vocational expert, also testified at the administrative hearing. She classified Craig's past work at Bristol Compressors as medium, semi-skilled, and his work at the cell phone company as light, unskilled.

Subsequent to the administrative hearing, in October 2009, Dr. Patel assessed Craig's Mental Residual Functional Capacity. He indicated that Craig's

highest GAF score was 60.[1]  Dr. Patel found Craig to be seriously limited but not precluded from performing unskilled work.  He did not explain the limitations supporting his assessment.  Dr. Patel also noted that Craig was unable to meet competitive standards necessary for semi-skilled and skilled work, but did not explain the limitations supporting his assessment.  Dr. Patel opined that Craig did not have a low IQ or reduced intellectual functioning.  He indicated that Craig's psychiatric condition did not exacerbate his pain or other physical symptoms.

Craig was also seen by Edward E. Latham, Ph.D., for a consultative psychological evaluation in October 2009.  Craig complained of blurred vision, hearing problems, diabetes, and depression.  Dr. Latham assessed Craig with an IQ score of 70 and concluded that his intellectual ability was borderline deficient.  He indicated that Craig had difficulty in consistently understanding, retaining, and following simple instructions, and doing routine, repetitive tasks.  Dr. Latham diagnosed Craig with major depression, moderate, recurrent, and a cognitive disorder.  He also opined that Craig would have moderate problems interacting with the public and getting along with co-workers.

---

[1]  The GAF scale is a method of considering psychological, social and occupational function on a hypothetical continuum of mental health. The GAF scale ranges from 0 to 100, with serious impairment in functioning at a score of 50 or below. Scores between 51 and 60 represent moderate symptoms or a moderate difficulty in social, occupational, or school functioning, whereas scores between 41 and 50 represent serious symptoms or serious impairment in social, occupational, or school functioning. See Am. Psychiatric Ass'n, *Diagnostic and Statistical Manual of Mental Disorders* 32 (4th ed. 1994).

After reviewing Craig's records and taking into consideration the testimony at the hearing, the ALJ determined that he had severe impairments of diabetes mellitus, diabetic neuropathy, hypertension, shortness of breath, depression/anxiety, and borderline intellectual functioning, but that none of these conditions, either alone or in combination, met or medically equaled a listed impairment.

Taking into account Craig's limitations, the ALJ determined that Craig retained the residual functional capacity to perform a range of medium work that involved occasional stooping, crouching, and crawling but did not involve working at heights or with dangerous vibrating machinery. He was restricted from performing work requiring reading narratives. The ALJ noted that Craig could work in a small group setting, but could not work with the public or be subject to production quotas. The vocational expert testified that someone with Craig's residual functional capacity could work as a vehicle cleaner, a building cleaner, and a nursery worker. The vocational expert testified that those positions existed in significant numbers in the national economy. Relying on this testimony, the ALJ concluded that Craig was able to perform work that existed in significant numbers in the national economy and was therefore not disabled under the Act.

Craig argues that the ALJ's decision is not supported by substantial evidence. Specifically, Craig argues that the ALJ erred by finding that he did not meet the requirements of Listing of Impairments 12.05C for mental retardation,

and by failing to accord proper weight to the medical opinions of Dr. Patel and Dr. Latham. For the reasons below, I disagree.

### III

The plaintiff bears the burden of proving that he is under a disability. *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972). The standard for disability is strict. The plaintiff must show that his "physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . ." 42 U.S.C.A. § 423(d)(2)(A).

In assessing DIB claims, the Commissioner applies a five-step sequential evaluation process. The Commissioner considers whether the claimant: (1) has worked during the alleged period of disability; (2) has a severe impairment; (3) has a condition that meets or equals the severity of a listed impairment; (4) could return to his past relevant work; and (5) if not, whether he could perform other work present in the national economy. *See* 20 C.F.R. § 404.1520(a)(4) (2009). If it is determined at any point in the five-step analysis that the claimant is not disabled, the inquiry immediately ceases. *Id.*; *McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983). The fourth and fifth steps of the inquiry require an assessment of the claimant's residual functional capacity, which is then compared

with the physical and mental demands of the claimant's past relevant work and of other work present in the national economy. *Id*. at 869.

In accordance with the Act, I must uphold the Commissioner's findings if substantial evidence supports them and the findings were reached through application of the correct legal standard. *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996). Substantial evidence means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (internal quotation marks and citation omitted). Substantial evidence is "more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966). It is the role of the ALJ to resolve evidentiary conflicts, including inconsistencies in the evidence. *Seacrist v. Weinberger*, 538 F.2d 1054, 1956-57 (4th Cir. 1976). It is not the role of this court to substitute its judgment for that of the Commissioner. *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990).

Craig argues that the ALJ's decision is not supported by substantial evidence. He presents two arguments.

First, Craig argues that the ALJ erred when she failed to find that he met or medically equaled Listing of Impairments ("LOI") 12.05C for mental retardation.

In order for a claimant to show that his medical condition meets or equals the severity of a listed impairment, he must present medical findings that meet or equal in severity all the listed criteria for the listed impairment. *Heckler v.*

*Campbell*, 461 U.S. 458, 460 (1983). LOI 12.05C defines mental retardation as "a significantly subaverage general intellectual functioning . . . initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22." The required level of severity for the disorder is satisfied by a full scale IQ of 60 through 70, combined with another impairment that imposes an additional and significant work-related limitation.

Craig asserts that when he obtained the IQ score of 70 *after* he was twenty-two, this created a rebuttable presumption of a fairly constant IQ score throughout his life. However, Craig's work history and daily activities refute this presumption. As noted by the ALJ, during his work at Bristol Compressors, Craig performed tests on manufacturing equipment, used machines and tools, wrote technical reports, and assembled compressors. He also attended vocational classes and earned a certificate as a machinist. Craig's work history, coupled with his extensive activities of daily living, precluded any likelihood that he met the requirements of LOI 12.05C.

Despite the lack of evidence supporting Craig's claim of mental retardation, the ALJ recognized his limited intellectual abilities in her residual functional capacity assessment. Furthermore, the ALJ restricted Craig from performing work that requires reading narratives, in an attempt to account for his poor reading skills. As a result, I find that the ALJ's determination is supported by substantial evidence.

Second, Craig argues that the ALJ failed to accord proper weight to the medical opinions of Dr. Patel and Dr. Latham.  Dr. Patel opined that Craig was seriously limited but not precluded from performing unskilled work, and that he was unable to meet competitive standards necessary for semi-skilled or skilled work.  Dr. Latham assessed Craig with an IQ score of 70 and indicated that he had difficulty in understanding, retaining, and following simple instructions, and doing routine, repetitive tasks.

A treating physician's medical opinion will be given controlling weight when it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 404.1527(d)(2) (2010).  However, the ALJ has "the discretion to give less weight to the testimony of a treating physician in the face of persuasive contrary evidence." *Mastro v. Apfel*, 270 F.3d 171, 178 (4th Cir. 2001).

In the present case, the ALJ considered the opinions of Dr. Patel and Dr. Latham but gave little weight to their assessments, for several reasons.  First, Dr. Latham was not a treating physician and thus his opinions are not afforded controlling weight. 20 C.F.R. 404.1527(d).  Second, Dr. Patel's findings were not accompanied by any rationale or explanation in support of the opinions.  Finally, the findings of Dr. Patel and Dr. Latham are inconsistent with the objective medical evidence of record.

Dr. Patel noted that Craig's GAF score was 60, which reflects only moderate symptoms in social or occupational functioning. (R. at 355.)  His office notes indicated that Craig was functioning well on his medication, and that he continued to be stable with no significant deterioration.  Dr. Patel also opined that Craig did not have a low IQ or reduced intellectual functioning, and that his psychiatric condition did not exacerbate his pain or other physical symptoms. (R. at 358.) Moreover, Dr. Latham's findings are contradicted by Craig's own testimony that he independently shopped, went to church where he interacted with preachers and people, hunted and fished, did housework, and took care of his father. (R. at 65-70, 72, 75-77.)

Notably, the ALJ did afford some weight to the medical opinions of Dr. Patel and Dr. Latham; she limited Craig to simple, non-complex tasks in a small group setting that are not subject to production quotas.  This decision was supported by substantial evidence.

IV

For the foregoing reasons, the plaintiff's Motion for Summary Judgment will be denied, and the defendant's Motion for Summary Judgment will be granted.  A final judgment will be entered affirming the Commissioner's final decision denying benefits.

DATED: November 28, 2011

/s/  James P. Jones
United States District Judge